SA:KLK

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

15 M - 10

- - - - - - - - - - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

- against -

ADAMOU DJIBO,

        Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - -X

COMPLAINT

(21 U.S.C. § 963)

EASTERN DISTRICT OF NEW YORK, SS:

        THOMAS E. WILBERT, being duly sworn, deposes and states that he is a Special Agent of the United States Department of Homeland Security, Homeland Security Investigations ("HSI"), duly appointed according to law and acting as such.

        Upon information and belief, on or about January 11, 2015, within the Eastern District of New York and elsewhere, the defendant ADAMOU DJIBO did knowingly and intentionally conspire with others to import into the United States from a place outside thereof a substance containing heroin, a Schedule I controlled substance.

        (Title 21, United States Code, Section 963).

        The source of your deponent's information and belief are as follows:[1]

        1.    I make this affidavit based on my personal involvement in the investigation, my training and experience, and information obtained from other law

---

[1] Because the purpose of this Complaint is to state only probable cause to arrest, I have not described all the relevant facts and circumstances of which I am aware. Unless otherwise indicated, where actions, conversations or statements of others are related herein, they are related in substance and in part.

enforcement agents and witnesses. The instant investigation arose after United States Customs and Border Protection ("CBP") officials stopped a co-conspirator (the "CC") at John F. Kennedy International Airport in Queens, New York, on or about January 11, 2015, and discovered approximately 6.8564 kilograms of heroin concealed in his suitcase. The CC arrived aboard Royal Air Maroc Flight 200 from Casablanca, Morocco but his trip had originated from Lome, Togo. Immigration records indicated that the CC last entered Togo on December 26, 2014 and made multiple previous trips to Togo, including in April/May 2014.

  2. HSI agents were notified and the CC was placed under arrest. The CC was advised of his Miranda rights, which he waived. He admitted, in sum and substance, that he knew he was importing heroin into the United States. He stated that he received the heroin from an individual in Togo with whom he had previously worked to import narcotics and that he was planning to deliver the heroin to DJIBO in the United States. The CC advised that he was planning to meet DJIBO at a nearby hotel in order to deliver the narcotics to DJIBO and that he expected to be paid approximately $50,000 to $55,000 for importing the heroin. The CC also stated that he had imported narcotics into the United States on at least one previous trip from Togo in May 2014, and that he was successful in avoiding detection on that occasion. He stated that DJIBO had organized both the May 2014 trip and the January 2015 trip.

  3. Incident to arrest, a mobile telephone was seized from the CC. The CC advised that the device contained contact information for DJIBO and gave oral consent for the HSI agents to search the device. A cursory search of the device confirmed that the CC communicated extensively with DJIBO and others using WhatsApp messages regarding the

importation of narcotics in January 2015 and May 2014. On January 22, 2015, the Honorable Lois Bloom, United States Magistrate Judge in the Eastern District of New York, authorized a search warrant for agents to conduct a more exhaustive search of the mobile telephone seized from the CC.

4. A further search of the mobile device revealed extensive communications between DJIBO and the CC regarding an ongoing scheme to import narcotics into the United States. Many of these communications contain coded language. Based on my training and experience, I know that individuals engaged in the importation and distribution of narcotics often communicate using coded messages in an effort to avoid detection. The CC also confirmed in his post-Miranda interview that he often communicated with DJIBO using medical terms as code words. For example, the CC advised that the word "surgery" was used to refer to narcotics.

5. In late 2014, DJIBO and the CC began communicating using WhatsApp messages to plan a trip in order to import narcotics. On or about December 7, 2014, the CC received a message from a telephone number known to belong to DJIBO asking "Whn du u wanna go c d doctor" (sic). Based on my training and experience, and from the CC's post-Miranda statements, I understand "doctor" to mean an individual located abroad who supplies narcotics to DJIBO and the CC for importation into the United States. DJIBO and the CC also discussed who will schedule "the appointment" and confirm that they plan to use "the same clinic u always do." I understand this to mean that DJIBO and the CC were discussing who would book a travel reservation (i.e., "the appointment") through a travel agency (i.e., the "clinic") that they had also used on previous trips. On or about December 10, 2014, DJIBO sent a message to the CC inquiring whether "d 26 is day u gonna

3

du the surgery" (sic) and on or about December 17, 2014, the CC confirmed to DJIBO that "26 is perfect". Immigration records indicate that the CC departed from the United States on December 26, 2014 for his trip to Togo.

6.      DJIBO and the CC also communicated regarding the quantity of narcotics they planned to import. On December 7, 2014, the CC sent a message to DJIBO inquiring "Are we doing two hands or one hand?" DJIBO responded, "Both hands" and "possibly" a "3rd one [w]il happened" (sic). I understand the CC to be asking if he would be carrying one or two suitcases packed with narcotics back into the United States (i.e., "two hands or one hand") and DJIBO's response to indicate that he was planning to bring two suitcases containing narcotics, with the possibility of adding a third. On or about December 17, 2014, the CC sent a message to DJIBO stating "We might do even three arms coz days are enough and good day" (sic). During his post-arrest interview, the CC stated that, based on the plan he made with DJIBO, he believed he was importing three kilograms of heroin on this trip.

7.      DJIBO and the CC discussed payment plans in their conversations as well. In the December 7, 2014 conversation, the CC stated to DJIBO that "Last April it was our 7th anniversary since our first surgery...so I think we need to upgrade ($) a little bit bro." Immigration records indicate that the CC made multiple previous trips to Togo, with the most recent trip (prior to the one preceding his arrest) in April 2014. Later, on December 21, 2014, DJIBO told the CC "Send me ur acct # for Wht u used for the prescriptions[]" (sic). The CC responds, "Don't u wanna us the WU?" (sic). I understand "WU" to refer to Western Union, a financial institution providing money transfer services. The following day, the CC again asked "So u will not do WU?" and DJIBO replies "Nt gud bro" (sic). DJIBO

4

instructs him to "Use wht u hv to get there n ma boy will replace it bck[.]" The CC then tells DJIBO that he is "gonna have two hands with me so incase we decide to go three on the surgery day...now if it is a little heavy I can pay for it ans show u the papers" (sic). I understand this to mean that the CC is requesting more money because he may be bringing an additional third suitcase of narcotics back to the United States with him, which will cost additional money that he does not have. The CC tells DJIBO that he "will send u the acc # (B.America)." DJIBO responds that "If u hv a trust frnd who has BOA acc dat wil be prfct so they wil put it there n he tke it n giv it to u" (sic). The CC then provides DJIBO with a specific account number and the name of the account holder for DJIBO to transfer the money. On or about December 26, 2014, the day that the CC departed for Togo, DJIBO sent a photograph via electronic message to the CC depicting a Bank of America document that appears to confirm that a deposit was made into the account designated by the CC.

8. DJIBO and the CC continued to communicate regarding the details of their efforts to obtain narcotics and transport them back to the United States during the time period when the CC was in Togo. DJIBO and the CC also made plans to meet when the CC returned to the United States with the narcotics. On or about January 10, 2015, the CC sent a message to DJIBO stating "When I'm done with surgery I will go straight to the recovery room as usual where u can be allowed to see me" (sic). I understand this to mean that DJIBO and the CC were planning to meet at a predetermined location to transfer the narcotics after the CC arrived back in the United States. In his post-arrest interview, the CC stated that he was planning to meet DJIBO at a nearby Best Western hotel in order to give DJIBO the suitcase containing the heroin. Finally, on or about January 11, 2015, the CC sent a message to DJIBO informing him that his plane "just touch[ed] down...one hr late." The CC was

5

arrested on his arrival. A final message was sent to the CC later that night from a number believed to belong to DJIBO inquiring "Bro r u k[?]" (sic).

WHEREFORE, your deponent respectfully requests that the defendant ADAMOU DJIBO be dealt with according to law.

　　　　　　　　　　　　　　　　＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿
　　　　　　　　　　　　　　　　THOMAS A. WILBERT
　　　　　　　　　　　　　　　　Special Agent
　　　　　　　　　　　　　　　　United States Department of Homeland Security,
　　　　　　　　　　　　　　　　Homeland Security Investigations

Sworn to before me this
4th day of February, 2015


THE HONORABLE VERA M. SCANLON
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK