

U.S. Department of Justice

United States Attorney
Eastern District of New York

F. # 2015R00200

271 Cadman Plaza East
Brooklyn, New York 11201

October 21, 2015

By ECF

The Honorable Sterling Johnson, Jr.
United States District Judge
United States District Courthouse
225 Cadman Plaza East
Brooklyn, New York 11201

      Re:    United States v. Adamou Djibo
                    Docket No. 15-CR-088 (SJ)

Dear Judge Johnson:

        The government respectfully submits this reply in opposition to the defendant's post-suppression hearing response, dated October 13, 2015 (Dkt. No. 61). At issue in this matter is whether the defendant's cellular telephone records were lawfully obtained pursuant to a search warrant. As the evidence presented in the suppression hearing shows, they were. The defendant's post-hearing submission attempts to muddy this issue by conflating the records obtained pursuant to that search warrant (the "Search Warrant Records") with a separate set of unrelated records obtained during an outbound border search at the airport (the "Border Search Records"). In fact, the Search Warrant Records are not derived from, based on or connected in any way with the Border Search Records. The Border Search Records contributed in no way to the probable cause giving rise to the search warrant for the Search Warrant Records. Long before the defendant was stopped at the airport, the electronic evidence in this case was overwhelming and it led straight to the defendant's cellular telephone. Realistically, there was simply no way the government would not have sought and obtained a search warrant for any electronic device found on the defendant based on that evidence, regardless of whether the initial border search of the device was conducted or not.

I.  The Border Search Was Routine And Constitutional

   A.  The Border Search Was Not Coercive

As an initial matter, it is important to note that two separate and distinct events occurred on the airport jetway on February 3, 2015. Although the defendant attempts to intertwine the details of each to bolster his suggestion that the border search was coercive, the evidence proves otherwise.

Initially, the defendant was selected for an outgoing border search by Customs and Border Protection ("CBP") officers and asked to step out of the boarding line. (7/13/15 Tr. at 16:21-24.) The entire interaction took place on the jetway, just steps away from the other boarding passengers. (Id. at 20:18 – 21:4.) The defendant was not taken to a separate room elsewhere in the airport. (Id. at 21:7-8.) He was not strip searched. (Id. at 21:15-16.) He was not placed under arrest. (Id. at 21:9-10.) His travel documents were checked, not confiscated. He was not forced to miss his flight. The entire interaction lasted approximately 10 minutes. (Id. at 21:5-6.) Importantly, the border search was performed according to routine procedure. (Id. at 23:16-21.) It was no more invasive and no more extensive than other outbound border searches performed at JFK Airport. (Id.) During the border search, the defendant appeared to understand that such is a routine part of air travel. He remained calm and helpful throughout and never appeared to be in any duress when providing the passcode. (Id. at 21:25 – 22:6.) Importantly, the defendant volunteered for this inquiry by virtue of attempting to board an international flight. It is no different that the millions of passengers who submit themselves to airport security searches—body scans, pat-downs, baggage x-rays, etc.—everyday by virtue of seeking to fly on commercial airlines. Travelers know, understand and accept the searches that accompany air travel today. Any passenger can refuse those searches by simply not flying. At any point the defendant could have avoided a border search by turning around and walking out of the airport. (Id. at 48:1-14.) But he did not. Rather, he chose to proceed across the border and submit to all that the departure process entails.[1] There is nothing about these conditions that suggest the situation was uncomfortable, much less coercive.

Subsequently, after the border search concluded, the CBP officers moved aside and HSI agents stepped in to execute a probable cause arrest. (Id. at 24:13-17.) Again, that probable cause arose from the earlier investigation and was based on overwhelming evidence that the defendant was involved in criminal activity. It did not arise from the border search. Following his arrest, the defendant was processed according to standard procedure. It was only then that he was taken away from the jetway and brought to HSI's offices inside the airport terminal for processing. (Id. at 24:18 – 25:3.) He was advised of his Miranda rights. (Id.) He was asked no questions, other than for routine pedigree information. (Id. at 25:4-9.)

---

[1] See 7/13/15 Tr. at 14:22 – 15:5 ("Q: Did the Defendant go to the airport on his own initiative that day? A: Yes. Q: You didn't lure him there, did you? A: No. Q: You didn't take him there yourself, did you? . . . A: We didn't take him there."); 16:16 ("Q: And the Defendant went to this point [the airplane jetway] by his own choice, right? A: Yes, he did.")

2

He was not interrogated. He made no statements. He was not asked for any information about his electronic devices at that time, including the passcodes, nor did he divulge such details.

The border search and the arrest are separate events, invoking different rights and conditions, and cannot be conflated. The custodial aspects of arrest were not present during the border search when the defendant volunteered his passcode and the defendant's rights were not violated during either event.

    B.    <u>The Defendant's Passcode Was Lawfully Obtained</u>

Courts around the country recognize that border searches such as this one can include questioning and inspection of a passenger's electronic devices. <u>See</u> <u>United States v. Young</u>, No. 12-CR-00210-RJA-JJM, 2013 U.S. Dist. LEXIS 33496, at *5 (W.D.N.Y. Jan. 16, 2013) (citing <u>United States v. Arnold</u>, 533 F.3d 1003, 1008 (9th Cir. 2008), cert. denied, 555 U.S. 1176 (2009) (Searches of computers and other electronic devices such as cellular telephones are "considered routine searches that may be conducted in the absence of reasonable suspicion" at the border.). <u>See</u> also <u>United States v. Linarez-Delgado</u>, 259 Fed. Appx. 506, 508 (3d Cir. 2007) ("Data storage media and electronic equipment, such as films, computer devices, and videotapes, may be inspected and viewed during a reasonable border search."). Accordingly, it was well within the scope of the agent's authority to inquire as to the devices that the defendant was carrying and the passcodes necessary to access them. There is no evidence whatsoever to suggest that the defendant was coerced into providing his passcode on the jetway. <u>See</u> 7/13/15 Tr. at 22:5-6 ("Q: What was his demeanor at that point [when the defendant was asked to provide his passcode]? A: He was calm, same as when he first was searched.") Nor is there any evidence that the passcode was obtained in violation of his <u>Miranda</u> rights.[2] Accordingly, the defendant's passcode was voluntarily provided and lawfully obtained.

The Court's inquiry should end there. That agents from the Department of Homeland Security, Homeland Security Investigations ("HSI") went on to actually perform a

---

[2]    It is well-settled that a traveler is not "in custody" during a border search and, accordingly, his right to <u>Miranda</u> warnings is not invoked. <u>See</u> <u>United States v. FNU LNU</u>, 653 F.3d 144, 153 (2d Cir. 2011) (denying appeal of motion to suppress statements obtained during border search without Miranda warnings). Rather, border examinations are "par for the course" when traveling internationally. <u>Id</u>. at 155. But even if the Court were to find that the defendant's passcode disclosure was involuntary, the remedy is merely to suppress the statement itself—<u>not</u> the fruits of the search. <u>See</u> <u>United States v. Patane</u>, 542 U.S. 630, 639 (2004) (holding that physical evidence obtained as a result of unwarned statements is not excluded by <u>Miranda</u>); <u>United States v. Capers</u>, 627 F.3d 470, 493-494 (2d Cir. 2010) ("An interrogating officer's failure to advise a suspect of his <u>Miranda</u> rights does not require suppression of the physical fruits of the suspect's unwarned statements."); <u>United States v. Morales</u>, 788 F.2d 883, 886 (2d Cir. 1986) ("The <u>Miranda</u> presumption of coercion . . . has not barred the use of unwarned, voluntary statements . . . to locate non-testimonial evidence[.]").

3

search on the cellular telephone is of no moment. That is because records obtained from that search were used for absolutely nothing. They did not give rise to the government's interest in the device's contents—that interest arose long before. They did not give rise to probable cause for a search warrant—that too existed long before. They are not among the evidence that the government will seek to admit at trial. They are not the target of the defendant's suppression motion. In short, the Border Search Records were not used, and will not be used, in any way.

II.     The Search Warrant Records Would Have Been Obtained Either With Or Without The Device's Passcode

The defendant cites Riley v. California, 134 S. Ct. 2473, 2485 (2014), for the proposition that "police 'must generally secure a warrant before conducting' a search of a cell phone incident to arrest." Def. Ltr. at 3. That is exactly what law enforcement did here. On March 3, 2015, the Honorable Ramon E. Reyes, Jr. issued a search warrant for the defendant's iPhone. Pursuant to that warrant, and using the passcode voluntarily provided by the defendant during his border search, HSI agents performed a forensic search of the device and obtained the records and data contained therein.

The evidence presented at the suppression hearing made clear, however, that even without using the passcode HSI agents would be able to access the device's contents and retrieve the telephone records. As Forensic Examiner David Bauer explained, continued advancements in technology make the defendant's iPhone's passcode penetrable today. One such advancement, an "IP Box", allows forensic examiners such as Special Agent Bauer to bypass an iPhone's passcode and access the device's contents by testing every possible passcode combination on the cellular telephone until the correct passcode is revealed. (7/29/15 Tr. at 83:12-25.) Based on extensive investigation, including tests conducted using the IP Box and conversations with other investigators and industry insiders, Special Agent Bauer determined that he would be able to successfully unlock the defendant's particular telephone using the IP Box and retrieve its contents even without knowing the defendant's passcode. The defendant offered no testimony from anyone with personal experience using the IP Box to refute Special Agent Bauer's testimony. Indeed, the only witness that the defendant offered admitted that he had no personal experience using the device, had not spoken with anyone with personal knowledge of the device, and based his opinion on a review of a 10-months outdated technical paper and an unverified website. (10/2/15 Tr. at 16:19 - 17:15; 23:12 - 17; 25:11 - 27:2.) Because the telephone records would inevitably be obtained even without the passcode, suppression of the telephone records is unwarranted.

III.    The Probable Cause For The Search Warrant Is Entirely Independent From The Border Search Records

The accessibility of the device—either by using the passcode or by bypassing the lock with an IP Box—is the central issue here. The Court should not be distracted from this by the defendant's attack on the irrelevant Border Search Records. The defendant's October 13, 2015 letter misses the mark when it suggests—absent any evidence whatsoever—that the Border Search Records somehow influenced the government's decision

4

to obtain a search warrant. Long before the Border Search Records were obtained, the investigation had already provided ample reason to obtain a search warrant for the defendant's cellular telephone, including the following:

- In early January 2015, a courier arrested for smuggling more than 6 kilograms of heroin into the United States informed law enforcement agents that the defendant had coordinated and paid for his trip (7/13/15 Tr. at 5:8-23);
- A search of the courier's cellular telephone revealed numerous electronic communications between the courier and the defendant detailing plans for multiple drug smuggling trips (7/13/15 Tr. at 7:19 – 10:14);
- These messages were exchanged using "WhatsApp," a mobile telephone application that users download onto their mobile device (7/13/15 Tr. at 8:3-11);
- Independent law enforcement records confirmed that the phone number used in the drug-related communications belonged to the defendant (7/13/15 Tr. at 10:19 – 12:3).

This evidence overwhelmingly suggests that there would be evidence of crimes, including heroin smuggling, on the defendant's cellular telephone. Based on this alone, it is inevitable that the government would have sought and obtained a search warrant for the defendant's iPhone.

The defendant, however, ignores this plethora of independent probable cause for a search warrant. Instead, the defendant erroneously asserts that law enforcement agents found the co-conspirator's name on the defendant's cellular telephone and suggests that this "discovery" somehow enticed them to conduct a further search. See Def. Ltr. at 6. Nothing could be further from the truth. There is simply no evidence at all that the agents even saw, much less relied on, a name buried somewhere in the phone records. Equally unavailing is the defendant's wildly inaccurate suggestion that the telephone's unique IMEI number was obtained from the border search. Id. That number is printed in plain sight on the back of the device. There is no need to even turn on the telephone in order to view it. See Ex. A, attached hereto (photograph of the defendant's iPhone with IMEI number). The defendant's fabricated attempt to make a connection between the Border Search Records and the search warrant is entirely baseless. The Court should give it no credit.

For all of the above reasons, the Court should deny the defendant's motion to suppress statements and physical evidence seized from the defendant.

Respectfully submitted,

ROBERT L. CAPERS
United States Attorney

By:   /s/ Karen L. Koniuszy
Karen L. Koniuszy
Assistant U.S. Attorney
(718) 254-6072

cc: Zachery Margulis-Ohnuma, Esq. (via ECF)
    Clerk of the Court (SJ) (via ECF)

# EXHIBIT A

