UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------- x
UNITED STATES OF AMERICA,

**MEMORANDUM & ORDER**

- against -

15 CR 00088 (RJD)

ADAMOU DJIBO,

Defendant.
-------------------------------------------------------- x

DEARIE, District Judge

Defendant Adamou Djibo was convicted by a jury of conspiring to import heroin and

related substantive charges. Throughout his nine-day trial in early 2016, the government

endeavored to paint a picture of Djibo as the leader of a heroin trafficking conspiracy,

responsible for orchestrating and funding numerous drug smuggling trips between Africa and the

United States. To prove its case, the government relied principally on the testimony of a single

cooperating witness, Stanley Walden, who was picked up by federal agents at JFK airport in the

possession of 6.4 kilograms of heroin at the end of an alleged Djibo-arranged drug trip. Walden

testified at trial that he was one of Djibo's drug couriers and provided details of the drug trips he

took on Djibo's behalf.

More than six months before trial, the government produced to defense counsel

approximately 50 pages of partially redacted cell phone communications between Walden and

Djibo, and represented it had produced "all portions [of Walden's telephone records] it considers

to be relevant." Jan. 8, 2016 Letter, ECF No. 96. Following numerous informal requests by

defense counsel, culminating in a motion to compel made two weeks before trial, the government

produced "a complete version" of Walden's cell phone records a mere three days before trial.

1

The government's production consisted of thousands of pages of cell phone communications, much of which were in Swahili and required translation. Defense counsel secured a single-day trial adjournment, enough to make a dent in its review of the government's voluminous production. A jury convicted Djibo on all counts and Djibo was sentenced to 293 months incarceration followed by five years of supervised release. Djibo's post-trial motions were denied. Djibo appealed his conviction and the District Court's denial of his post-trial motions. The Second Circuit vacated the District Court's denial of Djibo's motion for a new trial and remanded with instructions to provide defense counsel adequate time and resources to translate the government's production and then, if appropriate, renew post-trial motions. Djibo renews his motion under Federal Rule of Criminal Procedure 33 for a new trial, now with the benefit of translated versions of Walden's cell phone records. For the reasons that follow, Djibo's motion for a new trial is granted.

## BACKGROUND

### A. Arrest and Indictment

On January 11, 2015 federal agents arrested Stanley Walden at JFK Airport while he was attempting to smuggle approximately 6.4 kilograms of heroin in his suitcase on a return flight from Togo. Almost immediately Walden waived his <u>Miranda</u> rights and began cooperating with the government. Walden told his arresting agents that he "received the heroin from an individual in Togo" and that he planned to deliver the heroin to "Adam" in the United States in return for approximately $50,000. Complaint, ECF No. 1. Walden also told the arresting agents that "Adam" organized his trip to Togo, as well as at least one previous drug smuggling trip. <u>Id</u>.

Following leads provided by Walden, on February 3, 2015 federal agents arrested Djibo on the basis of a criminal complaint charging him with conspiracy to import heroin as he was boarding a plane at JFK Airport departing for England. Id. On March 5, 2015, a grand jury returned a four-count indictment charging Djibo with conspiring to import heroin, importing heroin, conspiring to possess heroin with intent to distribute and possessing heroin with intent to distribute it. ECF No. 6. On July 1, 2015, following additional cooperation from Walden, a grand jury returned a superseding indictment expanding the timeframe of the alleged conspiracy considerably from September 2014 – January 2015 to April 2008 – January 2015. ECF No. 22. On December 17, 2015 a grand jury returned a second superseding indictment including a Criminal Forfeiture Allegation. ECF No. 90.

## B. Relevant Pre-Trial Proceedings

On April 7, 2015, the government disclosed to defense counsel it had Walden's cell phone and that it had executed a forensic search of the cell phone.[1] ECF No. 11. Defense counsel promptly made a series of informal requests via letter seeking "any relevant items seized from [Walden], including but not limited to his WhatsApp records (some are mentioned in the Complaint but not found in Djibo's Cellebrite[2] report) and anything else from his phone." Def. Br., ECF No. 228, at 4. The government did not respond to defense counsel's requests, at which point defense counsel publicly filed a letter via ECF again requesting all information from Walden's cell phone, specifically including "any exculpatory material, and anything relating to the co-conspirator's drug trafficking with others." June 24, 2015 Letter, ECF No. 20.

---

[1] The contents of *Djibo's* cell phone were suppressed as fruit of an unlawful inquiry into Djibo's cell phone passcode or fruit of an "admittedly poisonous peek" into the contents of Djibo's cell phone. ECF No. 88, at 21-29. The government did not appeal.

[2] A Cellebrite report is a compilation of recoverable contents from a cellular device.

On July 5, 2015, the government produced an approximately 50-page excerpt from Walden's cell phone. ECF No. 26. The excerpt was partially redacted and contained only communications between Walden and Djibo. On January 13, 2016, a week before trial, the Court directed the government to produce the excerpt in unredacted form. Five days prior, on January 8, 2016, defense counsel moved to compel production of "a complete record" of Walden's cell phone communications. ECF No. 96. The Court ordered those records be produced for *in camera* review by January 14, 2016—less than a week before the trial's scheduled start date. After the government made its *in camera* production on Friday, January 15, 2016, the Court ordered it "to produce to defense counsel by close of business today a complete copy of the records delivered to the Court this morning." Jan. 15, 2016 Order. Defense counsel represents that the material was not made available until after 7 p.m. and that in light of technical difficulties associated with loading that volume of material, it was not available for review until late morning the following day—a Saturday. Def. Br., Case No. 16-3956, 2017 WL 2418211, at *13 (2d Cir. June 2, 2017). At this point, defense counsel had, after some deduplication, approximately 8,000 pages of new material, about half of which was in Swahili and required translation. Defense counsel requested the Court either (i) preclude the government from using any information from Walden's cell phone at trial *or* (ii) a "short" adjournment of trial to permit translation and review of the government's eleventh-hour production. Jan. 18, 2016 Letter, ECF No. 122. The government opposed Djibo's request, asserting that defense counsel had "all relevant portions" of Walden's cell phone records since July 2015. Jan. 12, 2016 Letter, ECF No. 105. The Court, crediting the government's representation, granted a single-day adjournment. Jan. 19, 2016 Tr. 8:6-10.

## C. Trial

Trial began on January 19, 2016.  The government initially intended to prove its case through the testimony of *three* of Djibo's alleged drug couriers:  Walden, Columbus Amankona and Emmanuel Boahene.  Before trial Djibo moved to strike testimony and other evidence related to Amankona and Boahene's participation in the alleged conspiracy on the grounds that the government had not sufficiently connected those individuals to Djibo.  The Court permitted Amankona and Boahene to testify "subject to connection" to Djibo.  After Amankona and Boahene testified, defense counsel renewed its motion to strike, which the Court granted. To that end, the Court provided the jury with a limiting instruction, stating, in relevant part:

> On Monday I instructed that some evidence that was presented to you was admitted subject to connection to this defendant, Adamou Djibo.  The Court has determined that some evidence shown to you and some testimony that you heard from some witnesses was not connected to this defendant, Adamou Djibo.
>
> I now specifically instruct you that evidence relating to two individuals, Columbus Amankona and Emmanuel Boahene was not connected to this defendant, Adamou Djibo.  You should disregard any evidence you heard about Columbus Amankona and Emmanuel Boahene and [you will] not have any evidence about these two individuals with you during your deliberation.
>
> Feb. 3, 2016, Tr. 1108:6-18.

Accordingly, Walden was the government's key witness.  He testified that he went on approximately nine or ten drug trips arranged by Djibo and on Djibo's behalf.  Walden explained that over the course of seven or eight years he and Djibo communicated about upcoming drug trips over phone and email using code words like "surgery" to obscure any reference to drugs, Djibo made travel arrangements for each drug trip on Walden's behalf, and Djibo facilitated Walden's travel by coordinating with his personal and familial contacts in Africa.  Through Walden, the government endeavored to establish a pattern: Djibo booked flights for and instructed his couriers to fly to Togo where they were greeted and escorted by one of Djibo's

contacts. The courier, with the help of Djibo's contacts, was clandestinely transported across the border to Ghana, where he would spend a couple of weeks socializing before returning to Togo. The purpose of the Ghana leg of the trip was to extend the courier's time away from New York in an English-speaking, "civilized . . . beautiful city" to make the number of heroin-filled suitcases the courier carried back to New York appear more believable to U.S. customs officials. Jan. 26, 2016 Tr. 634:21-23. After returning to Togo from Ghana one of Djibo's contacts would fill the courier's luggage with heroin, the courier would return to JFK and meet Djibo either at airport arrivals or at the Best Western airport hotel. At that point, the courier would unload the heroin and receive payment from Djibo. Crucial to Djibo's motion, Walden testified, and the government represented, that Djibo was his only contact in the drug smuggling world and that he only engaged in drug smuggling with Djibo. Jan.19, 2016 Tr. 124-28; Jan. 26, 2016 Tr. 602-603. Walden admitted he had not always been truthful during his cooperation with the government because he often attempted to minimize the nature and extent of his conduct. Walden insisted, however, that his trial testimony was truthful.

The government also presented testimony from a Homeland Security Investigations ("HSI") Special Agent and Tracfone employee in order to connect Walden's cell phone communications to Djibo, as well as another HSI Special Agent who testified about Djibo's arrest in February 2015. Finally, the government presented a civilian witness named Sarah Berhane, who testified that Walden was her "cousin's boyfriend" and that she loaned Walden $1,000 in December 2014, which was subsequently repaid. Djibo's brother-in-law briefly testified that Djibo asked him to deposit $1,000 in Berhane's bank account.

Djibo's defense was, primarily, that Walden—the government's only cooperating witness—was not credible. Defense counsel attempted, albeit hastily and unsuccessfully, to

confront Walden with *some* of the messages from the government's 8,000-page, eleventh-hour production. Counsel sought to impeach Walden's testimony that Djibo was his sole connection to the drug smuggling world and to show the jury that Walden was engaged in an ongoing effort to minimize his own role in the drug smuggling operation and misrepresent the extent and nature of his relationship with Djibo, to Djibo's detriment.[3] To that end, defense counsel endeavored to show that Walden's drug smuggling business in Africa was for his own benefit and that Djibo's only business dealings in Africa related to a legitimate car shipping enterprise. Moreover, defense counsel argued that the extensive communications between Walden and "Adam" could not be linked to Djibo himself and might have been sent by some other third party.

The Court charged the jury on February 3, 2016 and on February 5, 2016, the jury returned a guilty verdict on all counts.

### D. Post-Trial Motions and Sentencing

After the verdict, defense counsel filed an *ex parte* application requesting CJA funds for a translator to complete translations of all of the Swahili messages from Walden's cell phone. Post-trial motions were made without the benefit of translations of the materials contained in the government's eleventh-hour production. The Court denied Djibo's Rule 33 motion orally at sentencing. Dec. 9, 2016 Sentencing Tr. 8:7-8.

---

[3] In addition to sifting through thousands of pages of new material on the eve of and throughout the course of trial, the defense also encountered certain timing impediments during its cross-examination of Walden. The government's direct examination of Walden lasted the better part of the day on January 26, 2016. Defense counsel began its cross-examination late in the afternoon on the same day, immediately confronted by a litany of objections to counsel's attempt to translate small portions of the cell phone records just produced. The government also objected to the length of defense counsel's cross-examination, insisting it be completed by the close of the trial day and could not carry over to the following morning.

Djibo was sentenced to 293 months incarceration followed by five years of supervised release and forfeiture in the amount of $1,900,200, to be satisfied by Djibo's Connecticut home where his wife and five children resided. Djibo's 293-month sentence reflected an enhancement for involvement in at least 100 kilograms of heroin—an amount that accounted for quantities of heroin testified to by Amankona and Boahene, whose testimony was ultimately stricken from the record—as well as other role enhancements.

## E. Appeal

Djibo appealed his conviction and the denial of his Rule 33 motion and the Second Circuit affirmed in part, vacated in part, and remanded. United States v. Djibo, 730 F. App'x 52 (2d Cir. 2018). Significantly, the Second Circuit held that "without the complete translation [of Walden's cell phone records] it is impossible to determine whether [it] presents impeachment or exculpatory evidence" and "without the complete record, the Court cannot evaluate whether Djibo suffered prejudice by the government's late disclosure or whether refusal to provide resources for a Swahili translator prevented Djibo from mounting a fruitful defense." Id. at 56. The Second Circuit accordingly vacated the District Court's denial of Djibo's Rule 33 motion and remanded to the District Court to (i) provide Djibo resources for a Swahili translator, (ii) reasonable time to accomplish a thorough review of the records with the assistance of the translator, and (iii) the opportunity, if he then chooses, to renew his Rule 33 motion. Id. [4]

---

[4] The Second Circuit also concluded that Djibo's sentence of 293 months incarceration and 5-year supervised release was procedurally unreasonable, vacated Djibo's sentence and remanded to the district court for *de novo* resentencing. In particular, the total offense level reflected an enhancement for importing at least 100 kilograms of heroin. This consideration also infected the Court's forfeiture order, which the Second Circuit similarly vacated and remanded to the district court. Moreover, the district court's original sentence included enhancements for Djibo's role as the leader of the conspiracy—a role that is now put into doubt in light of the newly discovered evidence.

Having now had sufficient time and resources to translate the communications on Walden's cell phone, Djibo renews his Rule 33 motion on the grounds that three distinct sets of material communications were not disclosed in time for their effective use at trial in violation of the government's Brady obligations. The evidence consists of text and voice messages between Walden and a woman named Lily Lukamilwa sent and received in March and December 2014 as well as messages between Walden and another individual named Patrick Majollo sent and received in June 2014. Djibo asserts that portions of the government's eleventh-hour production constitute improperly suppressed exculpatory and impeachment Brady material and asks the Court to vacate his conviction and grant a new trial.

## LEGAL STANDARDS

### A. Federal Rule of Criminal Procedure 33

Rule 33 allows the Court to "vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). Courts maintain "broad discretion" to "avert a perceived miscarriage of justice," United States v. Ferguson, 246 F.3d 129, 133 (2d Cir. 2001), and must consider "whether it would be manifest injustice to let the guilty verdict stand" because there is "a real concern that an innocent person may have been convicted," United States v. Guang, 511 F.3d 110, 119 (2d Cir. 2007); see also United States v. Sanchez, 969 F.2d 1409, 1413 (2d Cir. 1992) ("By its terms, Rule 33 confers broad discretion upon a trial court to set aside a jury verdict and order a new trial to avert a perceived miscarriage of justice"). Cf. Ferguson, 246 F.3d at 133 (finding no "abuse of discretion *even though* we may have decided differently if we were the trial judge" where the trial judge "weighed the evidence of pecuniary motive and found the evidence . . . *insufficient to support the jury's finding of guilt beyond a reasonable doubt*" (emphasis added)). In considering a Rule 33 motion, the Court "is not

9

required to view the evidence in the light most favorable to the government" but must instead "take into account all facts and circumstances, and make an objective evaluation," United States v. Napout, 332 F. Supp. 3d 533, 548-49 (E.D.N.Y. 2018), "strik[ing] a balance between weighing the evidence and credibility of the witnesses and not wholly usurping the role of the jury," Ferguson, 246 F.3d at 133.

## B. Newly Discovered **Brady** Evidence

To secure a new trial in light of "newly discovered" Brady material a defendant must show that (i) the evidence at issue is Brady material because it is favorable to the defendant either because it is exculpatory or because it is impeaching, (ii) the government, either willfully or inadvertently, suppressed Brady evidence, and (iii) the failure to disclose Brady evidence resulted in prejudice. United States v. Coppa, 267 F.3d 132, 139 (2d Cir. 2001) (citing Strickler v. Greene, 527 U.S. 263, 282 (1999)). To establish prejudice, the defendant must show materiality or a "reasonable probability of a different result." Kyles v. Whitley, 514 U.S. 419, 433-34 (1995); Fuentes v. T. Griffin, 829 F.3d 233 (2d Cir. 2016) ("[T]he materiality standard for Brady claims is met when the favorable evidence could reasonably be taken to put the whole case in such a different light to undermine confidence in the verdict"); see also Djibo, 730 F. App'x at 56 (Brady requires disclosure of favorable evidence "in time for its effective use at trial" and "materiality [of undisclosed evidence] is determined by whether there is a reasonable probability, had the evidence been disclosed to the defense, the result of the proceeding would have been different").

# DISCUSSION

## A. The Government's Eleventh-Hour Production.

Djibo's renewed Rule 33 motion focuses principally on three sets of communications exhumed from the 8,000-plus pages of Walden's cell phone records produced on the eve of trial. Djibo argues, and the Court agrees, that taken together these communications tend to (i) undermine a significant feature of the government's case-in-chief: that Djibo was *the leader* of a heroin smuggling operation and thus possessed the heroin Walden attempted to smuggle through JFK airport in January 2015, and (ii) impeach Walden's credibility with respect to the nature and extent of his relationship with Djibo as well as his own leadership role in a drug smuggling operation.

First, Djibo's motion is based on a series of messages between Walden and a woman named Lily Lukamilwa, who Walden often referred to as his wife, sent and received in December 2014 shortly before Walden's arrest at JFK. According to Walden, he communicated with Lukamilwa in order to secure safe passage between Africa and the United States from a "spiritual advisor" connected to Lukamilwa. The communications reveal Walden providing Lukamilwa with his travel plans and Lukamilwa confirming that she has relayed those plans to a spiritual advisor, who would in turn conduct rituals and prayers on Walden's behalf.[5] For example, before he leaves for Africa, Walden tells Lukamilwa when he will cross a border or board a flight, specifically explaining that once he arrives in Africa he will "have to go through one of the countries by hiding without a stamp of entry that is where I am *buying my Choroko*

---

[5] Walden testified briefly about his relationship with Lukamilwa at trial based on defense counsel's initial cursory review of the government's production but he was not confronted or thoroughly cross-examined with the specific communications detailing his drug trip.

[drug] . . . Saturday is the day I will be coming back with my choroko on bags of rambo and passing through the tunnel so I can get out from the country which I will arrive early in morning on Sunday." Ex. G, ECF No. 228-9 (emphasis added).

A few days later, just before Walden is scheduled to depart New York, he communicates with Lukamilwa again and she relays a message from the spiritual advisor: "[S]he will make sure you travel safely; *you will carry your load* safely; you will load it safely; and you have gone through safely *you will sell it* and depart very quickly in no time; that is, it won't take long like the other times where you waited for some time *before you got paid.* She said, she said will be finished fast." Id. (emphasis added).

Second, Djibo points to another group of messages between Walden and Lukamilwa sent and received in March 2014, almost a year before Walden's arrest. Walden communicates with Lukamilwa on March 13, 2014 seeking safe passage and spiritual protection for a man named "Jefferson Diego Gomes da Silva" who is traveling from Brazil to Belgium. Walden tells Lukamilwa he wants da Silva "to arrive safely" because he is "carrying *your husband's job*." Ex. I, ECF No. 228-11 (emphasis added). The next day, Lukamilwa tells Walden she fears the "person we have cleared the way for . . . disappeared with *our* raw materials." Id. (emphasis added). Walden reassures Lukamilwa "I don't think so . . . they are people *I do business with.*" Id. (emphasis added). A few days later, Walden reaches back out to Lukamilwa and explains "there are *our people* who are making follow up to find out if the guys have swindled him or he became untrustworthy." Id. (emphasis added). The next day Lukamilwa tells Walden that da Silva has not swindled him and he "will come and *bring you the load* without any problem and

will pass all hurdles just fine…don't worry you just wait."[6] Id. Defense counsel's independent

investigation revealed Brazilian criminal records for an individual named Jefferson Diego

Gomez da Silva who was arrested in Brazil in early 2018. Def. Br., ECF No. 228, at 25; ECF

No. 228-12.

Finally, Djibo makes this motion on the basis of certain communications sent and

received from May 2014 through July 2014 between Walden and a man named Patrick Majollo

("Majollo"). Throughout their communications, Majollo consistently refers to Walden as "boss"

or "commander." Ex. A., ECF No. 234-1. At one point, they discuss "a job" with someone

named Steve who was previously incarcerated with Majollo "for four kilograms of marijuana."

Id. Majollo then says another man named "Chela the rock" "was sent" to Stockholm to "bring"

Majollo "the job" and that in two weeks' time Majollo will enter Holland "to pick up the clear

load." Id.

Djibo argues these messages undermine Walden's testimony that he held a subordinate

role in Djibo's drug smuggling operation and instead tend to minimize Djibo's own leadership

role, ultimately suggesting it was Walden, not Djibo, who possessed the smuggled heroin. For

example, Djibo argues that phrasing such as "*buying my* Choroko," "*you* will carry *your* load,"

"*you* will sell it" and "*you* got paid" indicates some element of possession—in other words, that

Walden *himself* purchased, and thus possessed, for his own benefit, the smuggled heroin. Djibo

also claims that Walden's more significant role in a smuggling operation is corroborated by the

March 2014 communications, which indicate Walden may have participated in drug smuggling

---

[6] Djibo's counsel attempted to make use of some translated portion of these communications during cross-examination. However, the government objected to counsel's use of a "several hundred page document . . . apparently in Swahili." Jan 27, 2016 Trial Tr. 723:9-13. When defense counsel asked to lead Walden through some of the communications based on an initial translation from his translator, the Court denied counsel's request. Id. at 724:15-17.

independent of Djibo, had his own "people" and had smugglers bringing *him* "the load." Similarly, Djibo claims the communications with Majollo show Walden is a "boss" or "commander" of potential drug smugglers and suggest Walden not only had his own contacts in the criminal underworld independent of Djibo, but had a supervisory role with respect to those contacts. Djibo argues that this evidence of participation and leadership in a smuggling operation only supports the notion that it was Walden, not Djibo who possessed the smuggled heroin, and discredits Walden's testimony that he was merely Djibo's aide. The government responds that not only are many of Walden's cell phone communications cumulative of Walden's trial testimony and other evidence proffered at trial, but also that Djibo's interpretation of the communications amounts to "pure speculation" leaving "no reasonable probability that Walden's credibility, which had already been attacked repeatedly by the defendant, would have been viewed significantly differently by the jury" if the jury had seen translated portions of these messages. Gov't Opp. Br, ECF No. 232, at 24.

## B. The Communications Constitute <u>Brady</u> Material Because They Tend to Be Exculpatory and Impeaching.

Djibo moves for a new trial on the ground that certain communications contained within the government's eleventh-hour production constitute new, previously suppressed evidence entitling him to a new trial pursuant to <u>Brady v. Maryland</u>, 373 U.S. 83 (1963). The government is required to disclose all material evidence favorable—here, exculpatory or impeaching—to a criminal defendant and commits a <u>Brady</u> violation when it fails to disclose such evidence. <u>United States v. Triumph Capital Group, Inc.</u>, 544 F.3d 149, 161 (2d Cir. 2008). Where newly discovered evidence is entirely "consistent" with the Government's case it is not exculpatory and thus not "favorable" to the defendant. <u>Id.</u> at 157, 161. However, "[w]here suppressed evidence

14

is inculpatory *as well as* exculpatory, and 'its exculpatory character harmonize[s] with the theory of the defense case,' a <u>Brady</u> violation has occurred." <u>United States v. Mahaffy</u>, 693 F.3d 113, 130 (2d Cir. 2012) (emphasis added) (quoting <u>Triumph Capital Grp.</u>, 544 F.3d at 164)); <u>Rankins v. United States</u>, 2019 WL 1109710, at *2 (S.D.N.Y. Mar. 11, 2019) ("Although <u>Mahaffy</u> does direct courts to consider whether suppressed evidence harmonizes with the theory of the defense, the evidence in question must still be in some way *exculpatory*"). Moreover, "[a]side from exculpatory material, <u>Brady</u> applies to material that 'would be an effective tool in disciplining witnesses during cross-examination," <u>Mahaffy</u>, 693 F.3d at 131, and that has "the potential to alter the jury's assessment of the credibility of a significant prosecution witness . . . put[ting] the case in such a different light as to undermine confidence in the outcome," <u>United States v. Rivas</u>, 377 F.3d 195, 199 (2d Cir. 2004).

As an initial matter, the communications from March and June 2014 could undermine Walden's testimony and the government's claim that he was Djibo's subordinate and that Djibo was his "only source of heroin and his only contact to the criminal underworld." Jan. 19, 2016 Tr. 124-28; Jan. 26, 2016 Tr. 602-603; Def. Br, ECF No. 228, at 43. As a result, these communications had "the potential to alter the jury's assessment of the credibility of [Stanley Walden]," <u>Rivas</u>, 377 F.3d at 199. Language such as "boss" or commander" and references to *your* "people" bringing *you* "the load," are words associated with a leader, not a mere courier or aide. Relatedly, these communications are also exculpatory because they tend to enhance Walden's role in a drug smuggling operation, lending support to the defense theory that Walden,

not Djibo, possessed the smuggled drugs and that Djibo was not a "leader" of a drug smuggling conspiracy.[7]

To that end, the March and June 2014 communications, are consistent with the defense theory that (i) Walden misleadingly provided testimony that would ultimately minimize his role in a drug smuggling operation—an ongoing trend in Walden's cooperation, (ii) Walden in fact played a more active role in a drug smuggling operation and thus (iii) Walden possessed the drugs he smuggled back to the United States, and was not acting as Djibo's vessel. Indeed, the communications from March and June 2014 indicate Walden was potentially involved in drug smuggling with at least two other individuals—da Silva and Majollo—and perhaps more, without any reference to Djibo. Moreover, Walden may have exercised some measure authority with respect to da Silva and Majollo's drug smuggling activities.

Although other evidence presented at trial indicates Djibo was at least *involved* in a heroin smuggling operation with Walden, the new communications suggest Walden was more than the aide or subordinate he described in his testimony. If Walden had been confronted with these communications, a jury might have (i) discredited some or all of Walden's testimony, and (ii) concluded that Djibo's role in the heroin importation operation was not sufficiently significant to merit a finding that he constructively possessed heroin with the intent to distribute it beyond a reasonable doubt.

---

[7] Indeed, two of the four counts on which Djibo was indicted and convicted relate to his "possession" of over one kilogram of heroin. Accordingly, the government was required to prove beyond a reasonable doubt that even if Djibo did not *physically* possess the smuggled heroin, in light of his leadership role in the smuggling operation, he was in constructive possession such that he "had the power and intention to exercise dominion and control over the heroin." United States v. Rodriguez, 392 F.3d 539, 548 (2d Cir. 2004) (quoting United States v. Payton, 159 F.3d 49, 56 (2d Cir. 1998)).

## C. The Communications Were Suppressed.

Having concluded that portions of the government's eleventh-hour production constituted Brady material, the government falls short of its Brady obligations only to the extent it suppresses the exculpatory or impeaching material. The government's Brady obligation stems from the principle that a defendant cannot be denied access to exculpatory evidence *only known to the Government.* United States v. Grossman, 843 F.2d 78, 85 (2d Cir. 1988) ("[T]he government ha[s] a duty to disclose only information which has been known to the prosecution but unknown to the defense"). Therefore, "evidence is not considered to have been *suppressed* within the meaning of the Brady doctrine if the defendant or his attorney either knew, or should have known, of the essential facts permitting him to take advantage of that evidence." United States v. Reese, 961 F. Supp. 2d 562, 563 (S.D.N.Y. 2013) (emphasis added) (citing United States v. Paulino, 445 F.3d 211, 225 (2d Cir. 2006)); see also Mahaffy, 693 F.3d at 131 n.11 (noting "[i]t is not enough that a defendant knew a potential witness's identity; the defendant had to know or should have known the essential facts permitting him to take advantage of any exculpatory evidence").

Moreover, simply because the government discloses Brady material *at some point* before trial, does not by itself indicate the government has satisfied its Brady obligations. Instead, the government must disclose all Brady material in time for its "*effective* use at trial." Coppa, 267 F.3d at 142 (emphasis added). While "[t]he required timing for disclosure depends on the materiality of the evidence and the circumstances of each case," the Court should use its "discretion to order Brady/Giglio disclosure at any time as a matter of sound case management." United States v. Greebel, 2018 WL 3900496, at *43 (E.D.N.Y. Aug. 14, 2018); see also United States v. Mohamed, 148 F. Supp. 3d 232, 246 (E.D.N.Y. 2015) ("Early disclosures . . . may be

appropriate where the Defense would require significant time to investigate and make effective use of the disclosure"). Critically, where "disclosure is first made on the eve of trial . . . the opportunity to use [Brady material] may be impaired. The defense may be unable to divert resources from other initiatives and obligations that are or may seem more pressing. And the defense may be unable to assimilate the information into its case." United States v. Gil, 297 F.3d 93, 106 (2d Cir. 2002) (quoting Leka v. Portuondo, 257 F.3d 89, 101 (2001)). Even where "the government discounts the significance of the [Brady material] . . . the government runs a certain risk when it turns so late documents sought by the defense for so long." Id.

The government did not produce "a complete version" of Walden's cell phone records, including the exculpatory and impeaching communications that are the subject of this motion, until just a few days before trial. This production came after the government represented it had produced "all portions [of Walden's telephone records] it considers to be relevant," ECF No. 96, *and* after a Court order compelling production of the cell phone records by a date and time certain, Jan. 15, 2016 Order Granting Mot. to Compel. Though the material was technically produced before trial, it was not disclosed "in time for its effective use at trial." Coppa, 267 F.3d at 142. The material, once deduplicated, consisted of approximately 8,000 pages of communications, half of which were in Swahili. On appeal, the government conceded it "would have been the better practice to have provided [Walden's cell phone records] earlier" but argued that the evidence was nevertheless not "suppressed" because defense counsel used portions of it to cross-examine Walden. Gov't Br., Case No. 16-3956, 2017 WL 3843030, at *32 (2d Cir. Sept. 1, 2017). Hastily and desperately attempting to make use of a brief excerpt taken from over 8,000 pages of new material and amidst a litany of authenticity objections does not fall within the realm of "effective use." "Effective use" means that defense counsel is afforded the

opportunity to build a defense narrative, not resigned to scattershot cross-examination or cross-examination-by-chance, picking up whatever lines from an 8,000-page Cellebrite extract it can to lob at the government's witness.

Djibo was deprived of the opportunity to make effective use of <u>Brady</u> material. The government's belated disclosure did not afford him the time to craft a defense narrative and adequately confront the witness against him or otherwise "assimilate the information into [his] case." <u>Gil</u>, 297 F.3d at 106. Perhaps it would have been prudent for Djibo to have made his motion to compel at an earlier date, but neither Djibo nor his attorney knew or should have known the volume of the material or that there were specific communications between Walden and third parties contained exculpatory or impeaching material. The obligation to produce <u>Brady</u> material in time for its "effective use at trial" falls on the government. Accordingly, the government denied Djibo the opportunity to make effective use of the material at trial.

### D. The Suppression of <u>Brady</u> Material Resulted in Prejudice.

The government's suppression of <u>Brady</u> material warrants a new trial only to the extent it results in prejudice to the criminal defendant. In other words, the suppressed <u>Brady</u> evidence must be "material." "A showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal, but rather a conviction must be reversed upon a showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." <u>Mahaffy</u>, 693 F.3d at 127; <u>see also</u> <u>Kyles</u>, 514 U.S. at 434 ("The touchstone of materiality is a reasonable probability of a different result, and the adjective is important"); <u>United States v. Monteleone</u>, 257 F.3d 210, 225 (2d Cir. 2001) (Calabresi, J.,

dissenting) ("[T]he fact that a jury *could* convict does not mean that it will.   And defendants must have a fair opportunity to convince the jury that it should not do so").

Evidence is not "material" if it is cumulative of what was already presented at trial, United States v. Spinelli, 551 F.3d 159, 165 (2d Cir. 2008), and "where the evidence against the defendant is ample or overwhelming, the withheld Brady material is less likely to be material than if the evidence of guilt is thin." Gil, 297 F.3d at 103. On the other hand, where withheld Brady evidence tends to contradict or discredit "the *sole evidence* at trial connecting [the defendant] to the [crime]," it is more likely material.  Leka, 257 F.3d at 104 (emphasis added); see also United States v. Wong, 78 F.3d 73, 79 (2d Cir. 1996) (where witness whose testimony is attacked "supplied the *only* evidence linking the defendant(s) to the crime . . . or where the likely impact of the witness's credibility would have undermined a critical element of the prosecution's case" evidence is material).  Similarly, Brady evidence is "material" if it "would have done more than merely provide an additional basis for impeachment" but rather would have "called squarely into question the credibility of [Walden], the government's key cooperating witness, regarding his claim that he [only ever smuggled drugs with Djibo]."  Mahaffy, 693 F.3d at 127.  Indeed, if, absent the impeaching Brady evidence, the defendant could only "chip away on cross examination" but was ultimately "denied the assault that was warranted" on the government's witness, the government's suppression of Brady evidence results in prejudice to the defendant and warrants a new trial.  Id. at 132.

The Second Circuit's decision in United States v. Rivas, another drug smuggling case, is instructive.  There, the government's key cooperating witness "initially denied any involvement in drug trafficking, but later admitted that he helped [the defendant] with drug trafficking." 377 F.3d at 197.  Specifically, the witness told prosecutors, who subsequently failed to inform the

defendant, that he was the one who carried the drugs ultimately found in the defendant's cabin on board the ship where they both worked. Id. at 197-98. At trial, the defense theory was that the cooperating witness, *not the defendant*, possessed the drugs. Id. The Second Circuit concluded that the witness' statement was both consistent with his "trial testimony indicating that [the defendant] owned the drugs" but also exculpatory because the statements "supported the defense's theory that [the witness] possessed the drugs all along and blamed [the defendant] for them" and was therefore material. Triumph Capital Group, Inc., 544 F.3d at 165 (citing Rivas, 377 F.3d at 198-200). Moreover, the Court reasoned that although the cooperating witness' disclosure was consistent with his trial testimony that the narcotics belonged to the defendant, this was nevertheless an "unusual case where a late-disclosed statement can be viewed as having both an inculpatory and an exculpatory effect" and "the fact that the [cooperating witness] brought the narcotics on board might well have been viewed by the jury as a critical piece of evidence supporting the defense theory." Rivas, 377 F.3d at 199. Therefore, "at a minimum, the disclosure would have created a reasonable likelihood that, after hearing it, the jury's suspicion about [the cooperating witness] would have led to a reasonable doubt about [the defendant's] guilt." Id. Indeed, the Court noted that the disclosure "would have been especially significant when added to the evidence that [the cooperator] had trafficked in narcotics before [and] had lied to customs agents about his dealings in narcotics." Id. at 200 (emphasis added).

Taken together, the communications between Walden and Lukamilwa and Walden and Majollo are material, and as a result, their late disclosure was prejudicial and merit a new trial. First, "the sole evidence at trial connecting [Djibo] to the [drugs] was the . . . testimony of [Walden]" supplemented by Walden and Djibo's cell phone coded communications. Leka, 257 F.3d at 104. While the cell phone records might suggest Djibo's *involvement* in a heroin

21

importation operation, it is Walden's trial testimony alone that the government relies on to corroborate Djibo's leadership role and ultimate *possession* of the smuggled heroin. Accordingly, evidence contradicting or otherwise discrediting Walden's trial testimony "create[s] a reasonable likelihood that, after hearing it, the jury's suspicion about [Walden] would have led to a reasonable doubt about [Djibo's] guilt" with respect to the possession charges. Rivas, 377 F.3d at 199.

Second, the communications in the government's belated production are not, as the government argues, immaterial, cumulative impeachment evidence. To the contrary, this evidence provides the jury with *an additional basis* to discredit Walden's testimony concerning the nature and extent of his relationship with Djibo and his own role in a drug smuggling operation. The fact that Walden may have been involved in drug smuggling with other individuals, individuals who called him "boss" or "commander" and with whom there is no connection to Djibo, combined with evidence suggesting Walden had his own "people" conducting surveillance to ensure someone would bring *him* "the load" "might well have been viewed by the jury as [] critical piece(s) of evidence supporting the defense theory" that Walden consistently, and deceptively, minimized his role in the drug smuggling operation, when he in fact possessed the drugs he smuggled back from Africa. Rivas, 377 F.3d at 199. Such a determination would have been "especially significant" in light of the fact that Walden had a pattern of lying to government officials and minimizing his conduct and relative culpability throughout his cooperation. Id. at 200.

## CONCLUSION

Even if "it cannot be gainsaid that this trial would have looked *radically* different" with the new evidence, Djibo is entitled to "a fair opportunity" to convince a jury of his peers that it

should not convict. <u>Monteleone</u>, 257 F.3d at 225 (Calabresi, J., dissenting) (emphasis added). "That opportunity, moreover, must be untainted by misguided government attempts to tilt the scales in its favor." <u>Id</u>. The government's <u>Brady</u> violation deprived Djibo of the opportunity to mount a proper defense and otherwise make "effective use" of thousands of pages of foreign language cell phone records produced on the eve of trial. And, because the records pertained *exclusively* to the government's critical cooperating witness, the potential for prejudice looms large. The Court maintains broad discretion to order a new trial to avert a possible miscarriage of justice and the Court finds that such an exercise of discretion is appropriate in this case. Accordingly, Djibo's motion for a new trial pursuant to Federal Rule of Criminal Procedure 33 is granted.

A pretrial conference will be held before the undersigned on May 1, 2019 at 11:00 AM.

SO ORDERED.
Dated: Brooklyn, New York
April 8, 2019